1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOSEPH P. CUVIELLO, et al.,

11          Plaintiffs,                      Civ. No. S-11-2456 KJM EFB

12      vs.
                                             ORDER
13   CAL EXPO, et al.,

14          Defendants.

15   _____/

16          This case was on calendar on July 12, 2013, for argument on motion plaintiffs'

17   motion for a temporary restraining order and preliminary injunction.  Plaintiff Joseph Cuviello

18   appeared pro se; Gilbert Leigh appeared for plaintiffs Deniz Bolbol and Shannon Campbell; and

19   Matthew Siroka appeared for plaintiff Mark Ennis.  George Acero appeared for defendant Cal

20   Expo; Erich Lidl appeared telephonically for defendant Rocky Mayes.

21          After considering the parties' arguments, the court granted plaintiffs' request for a

22   temporary restraining order, permitting them to leaflet outside of Cal Expo's Free Expression

23   Zones during the State Fair.  (ECF No. 124.)  This order confirms the court's order as a

24   preliminary injunction, explains the court's reasoning and addresses plaintiffs' other contentions.

25   /////

26

1

1   I.  BACKGROUND

2           Plaintiffs Joseph Cuviello, Deniz Bolbol, Shannon Campbell and Mark Ennis are

3   members of Humanity Through Education, a group that seeks to educate the public about the

4   abuse and mistreatment of animals, including tigers and Asian elephants, used by circuses and

5   other entertainment groups.  (First Amended Complaint (FAC) ECF No. 30 ¶¶ 20, 22.)  As part

6   of their educational activities, they hold signs and banners, offer informational leaflets and show

7   video footage of the mistreatment of circus animals.  (ECF No. 30 ¶ 21.)  Cal Expo is "a separate

8   entity in state government," governed by its own Board of Directors.  *Arnold v. California*

9   *Exposition & State Fair*, 125 Cal. App. 4th 498, 504 (2004); CAL. FOOD & AGR. CODE § 3301.

10          The Carson and Barnes Circus leased Parking Lot A on the Cal Expo grounds for

11  performances from May 20-22, 2011.  (ECF No. 30 ¶ 30.)  Without securing the permit required

12  at that time by Cal Expo's Free Speech Guidelines, plaintiffs arrived at Cal Expo on May 20 and

13  protested at Parking Lot A, near the entrance to the circus.  (ECF No. 30 ¶¶ 34, 43.)  They were

14  eventually arrested for trespassing.  (ECF No. 30 ¶¶ 58, 61.)  They returned to protest the circus

15  on May 21 and 22, but remained on the sidewalk and did not attempt to go onto Cal Expo's

16  grounds.  (ECF No. 30 ¶¶ 79, 89.)  Plaintiffs filed suit alleging a number of causes of action,

17  including a facial and as applied First Amendment challenge to Cal Expo's Free Speech

18  guidelines.

19          During the pendency of this action, Cal Expo adopted new Free Speech

20  Guidelines.  (*See* ECF No. 99 at 4-12.)  On June 14, 2013, plaintiffs filed their motion for a

21  temporary restraining order and preliminary injunction.  (ECF No. 103.)  The motion challenges

22  Cal Expo's revised Guidelines' Free Speech Zones as imposed during the State Fair; Cal Expo

23  concedes the Fair constitutes a public forum.  (ECF No. 104 at 19.)  In conjunction with their

24  motion, plaintiffs filed declarations from plaintiffs Bolbol, Campbell, Ennis and Cuviello

25  describing their animal-rights activism and their intent to protest the "numerous exhibitions and

26

1  events occurring during the State Fair that involve animals and present an opportunity to educate

2  the public about their treatment and/or to protest their mistreatment.  For example, there are

3  rodeo-style events and 'live birth' farm animal exhibits /displays." (Decl. of Deniz Bolbol, ECF

4  No. 105 ¶ 10; *see also* Decl. of Shannon Campbell, ECF No. 106 ¶ 10; Decl. of Joseph Cuviello,

5  ECF No. 107 ¶ 21; Decl. of Mark Ennis, ECF No. 108 ¶ 10.)[1]  Plaintiffs aver that they will not

6  stay in Cal Expo's Free Expression Zones because of their beliefs that they will not have

7  adequate access to the public if they cannot move freely to offer leaflets to patrons and address

8  them in a normal conversational tone.  (ECF No. 105 ¶ 12; ECF No. 106 ¶ 12; ECF No. 107

9  ¶ 23; ECF No. 108 ¶ 12.)  Counsel Leigh filed a declaration attaching a copy of Cal Expo's

10  revised Free Speech Guidelines, maps of Cal Expo, and a printout from Cal Expo's website

11  showing upcoming events.  (ECF No. 109 & Exs. A-D.)

12          On June 25, 2013, Cal Expo filed its opposition to the motion, along with

13  declarations of Rick Pickering, Cal Expo's CEO, and Robert Craft, Cal Expo's Chief of Police.

14  (ECF No. 111.)  Cal Expo also asked the court to take judicial notice of both versions of Cal

15  Expo's Free Speech Guidelines and of several regulations governing Cal Expo.  (ECF No.

16  111-3.)

17          On July 2, 2013, plaintiffs filed their reply and a request to exceed the page limit

18  for their memorandum of points and authorities.  (ECF Nos. 114, 119.)  Each plaintiff filed an

19  additional declaration in connection with the reply, describing their history of animal-rights

20  activism and the range of issues each has protested, as well as the locations of some of their

21  /////

22

23          [1] The plaintiffs aver each has attached a printout of the State Fair's animal-related events
24  to each declaration, but each in fact attaches a copy of an order in *Cuviello v. City of Oakland*,
    No. C-06-05517 NHP (EMC) (N.D. Cal.).  *See* ECF Nos. 105, 106, 107, 108 & Exs. A.
25  However, Cal Expo does not dispute that the State Fair hosts various animal-related events and
    displays, so the court will accept as true plaintiffs' claims, at least as to the exhibits at the State
26  Fair.

1  protests.  (*See generally* Decl. of Mark Ennis, ECF No. 115; Decl. of Joseph Cuviello, ECF No.

2  116; Decl. of Deniz Bolbol, ECF No.117; Decl. of Shannon Campbell, ECF No. 118.)

3  II.  THE CURRENT MOTION

4       A.  The Revised Free Speech Guidelines

5           Cal Expo's Revised Guidelines provide in relevant part:

6           [] "Free Expression Zone" — A free expression zone is a
            designated area located on-site as established by the Cal Expo's
7           chief executive officer (general manager), deputy general manager,
            or any individual designated in writing by Cal Expo's chief
8           executive officer, at which members of the public may be provided
            reasonable access in accordance with these guidelines for purposes
9           of conducting free speech activities.

10          [] "Free Speech Activities" — For purposes of these guidelines,
            "free speech activities" mean individual or group display of signs
11          other than specifically allowed herein; picketing, leafleting,
            collection of signatures or marching and any group activity
12          involving the communication or expression, either orally or by
            conduct of views and/or grievances, and which has the effect and
13          intent or propensity to express that view or grievance to others.  As
            used in these guidelines, neither the definition of or limitations on
14          "free speech activities" includes one-on-one voluntary discussions
            or individual wearing of buttons or symbolic clothing.

15

            .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
16
            . . . . Cal Expo finds that, with the exception of the annual State
17          Fair, no public forum events are sponsored or take place upon [the]
            grounds of Cal Expo.  It is the policy of Cal Expo, nevertheless, to
18          allow free speech activity wherever said activity is not inconsistent
            with the normal operations or activities of Cal Expo.  Cal Expo
19          finds, however, that due to the unique nature of the grounds of Cal
            Expo, there is limited access necessitating creation of free
20          expression zones.  Cal Expo specifically finds that the buildings
            and grounds comprising Cal Expo's grounds are generally
21          surrounded by parking areas under the control of Cal Expo, but
            which areas become congested with numerous vehicles during
22          events.  Cal Expo further finds that pedestrian traffic is generally
            confined to narrow walkways to and from these parking areas to
23          the various gates of the fairgrounds and that the designated free
            expression zones are designed to balance the interests of those
24          engaged in free speech activity and being given reasonable access

25  /////

26

4

1

2

to the patrons of events of Cal Expo, and the safety of patrons and prevention of accidents or congestion which could lead to injury.

3

4

5

6

7

8

. . . Further,  Cal Expo finds that these guidelines in the providing of free expression zones are balanced to protect the interests of patrons attending events upon Cal Expo's fairgrounds from inappropriate activity or conduct by those engaged in free speech activity, with the interests of those engaged in such free speech activities.  Cal Expo's solution to this balancing of interests is designation of free expression zones and restrictions on time, place and manner of said expressions to ensure reasonable access by those engaged in free expression activity to those attending the fairgrounds, while protecting the overall safety of the public.  In addition, Cal Expo finds that for the annual State Fair, for-rent booths are provided to anyone on a first-come, first-serve basis in addition to free expression zones.[2]

9

10

11

12

13

14

2.   Free Expression Zones: Cal Expo shall designate free expression zones on site for the purpose of providing access for free speech activity.  These zones shall be selected by Cal Expo and shall be designated on the map of the fairgrounds.  The area selected by Cal Expo shall be selected to provide maximum reasonable access by those involved in First Amendment activities to patrons of the Fair, commensurate with public safety as well as the safety of those individuals engaged in such activity, and shall interfere to the minimal extent possible with the free flow and passage of patrons to and from the parking areas and Cal Expo's fairgrounds . . . .

15

16

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

17

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

18

Any organizations or individuals seeking to engage in First Amendment activities . . . shall comply with the following restrictions on time, place and manner:

19

20

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

21

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..

22

23

[] No one using a free expression zone shall leave said zone for purposes of infringing on any other individual or groups' use of other free expression zones engaging in free expression activity or

24

preventing any such activity that originated in the free expression zone; . . . .

25

26

[2]  These findings have not changed from the 2009 Guidelines.

5

1                    [] No more than 10 individuals from any one group shall be

2                    assigned space within any one free expression zone.

3  (ECF No. 99 at 7-8.)

4      B.  Standing

5          "To seek injunctive relief, a plaintiff must show that he is under threat of

6  suffering 'injury in fact' that is concrete and particularized; the threat must be actual and

7  imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of

8  the defendant; and it must be likely that a favorable judicial decision will prevent or redress the

9  injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  In this case, each plaintiff has

10  averred that he or she seeks to protest animals-as-entertainment at the State Fair and that each

11  wants to engage patrons by conversation or leafleting outside the Free Expression Zones.  (*See*

12  Decl. of Deniz Bolbol, ECF No. 105 ¶¶ 9, 12; Decl. of Shannon Campbell, ECF No. 106 ¶¶ 9,

13  12; Decl. of Joseph Cuviello, ECF No. 107 ¶¶ 20, 23; Decl. of Mark Ennis, ECF No. 108 ¶¶ 9,

14  12.)[3]  Defendant has cited nothing in support of its argument that to show standing, plaintiffs

15  must show they have a long history of protest at this locale.  Plaintiffs' declarations establish

16  their standing as to Guidelines as applicable to the State Fair.

17          Plaintiffs have not, however, established standing based on their intent to protest

18  at other animal events held on Cal Expo's grounds after the State Fair has closed, as they have

19  not identified a currently scheduled event that will draw them to the area.  *See Lopez v.*

20

21       [3]  Plaintiffs have submitted additional declarations in reply, providing more information
about their animal-rights protest activities.  However, as noted in the order addressing their first
22  request for an injunction, the court will not consider these additional declarations submitted with
the reply.  *Zamani v. Carnes,* 491 F.3d 990 (9th Cir. 2007) (court need not consider arguments
23  raised for the first time in a reply brief); *Coleman v. Brown*, __ F. Supp. 2d __, 2013 WL
1397335, at *24 n.35 (E.D. Cal. Apr. 5, 2013) (stating that "the time and place" for a movant to
24  submit evidence in support of the motion is with the motion, not the reply); *USF Ins. Co. v.
Smith's Food and Drug Ctr.*, __ F. Supp. 2d __, 2013 WL 438585, at *13 n.1 (D. Nev. Feb. 4,
25  2013) (declining to consider new evidence movant "improperly introduced" with a reply);
*Contratto v. Ethicon, Inc*., 227 F.R.D. 304, 309 n.5 (N.D. Cal. 2005) (stating that movants'
26  attempt to introduce new evidence in connection with their reply papers is improper).

1   *Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (even in the First Amendment context, plaintiffs

2   must show "a concrete plan to violate the law in question by giving details about their future

3   speech such as when, to whom, where, and under what circumstances." (interior citation,

4   quotation marks omitted)).

5           Because plaintiffs have established standing only as to the State Fair, which is a

6   public forum event, the court will not consider defendant's argument that Cal Expo is not a

7   public forum at other times.

8           C.  Standard for Injunctive Relief

9           Injunctive relief is an extraordinary remedy that may only be awarded upon a

10  clear showing that the moving party is entitled to such relief.  *Winter v. Natural Res. Def.*

11  *Council, Inc.*, 555 U.S. 7, 22 (2008).  As provided by Federal Rule of Civil Procedure 65, a court

12  may issue a preliminary injunction to preserve the relative position of the parties pending a trial

13  on the merits.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The party seeking

14  injunctive relief must show it "is likely to succeed on the merits, . . . is likely to suffer irreparable

15  harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that

16  an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

17          Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or

18  "serious questions" test, which allowed a court to balance the elements of the test "so that a

19  stronger showing of one element may offset a weaker showing of another."  *Alliance for the Wild*

20  *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Clear Channel Outdoor, Inc. v.*

21  *City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)).  Recently, the Circuit has found that its

22  "serious question" sliding scale test survived *Winter*: a court may issue a preliminary injunction

23  when the moving party raises serious questions going to the merits and demonstrates that the

24  balance of hardships tips sharply in its favor, so long as the court also considers the remaining

25  two prongs of the *Winter* test.  *Cottrell*, 632 F.3d at 1134-35.  However, a court need not reach

26

7

1 | the other prongs if the moving party cannot as a threshold matter demonstrate a "fair chance of

2 | success on the merits." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (quoting

3 | *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008); internal quotations omitted).

4 |     D.  Likelihood of Success on the Merits--Free Expression Zones

5 |         In the current motion, plaintiffs challenge the Free Expression Zones, arguing that

6 | they are not narrowly tailored to serve a significant public interest, do not leave open ample

7 | alternative channels for communication, and delegate too much discretion to Cal Expo officials.

8 | (ECF No. 104 at 19.)  Plaintiffs raise similar challenges in the complaint as part of their

9 | challenge to the 2009 Guidelines.  Because of the similarity between the different guidelines

10 | versions, there is sufficient connection between the instant motion and the merits of the

11 | underlying complaint for the court to consider the challenge.

12 |         Although restrictions on speech are disfavored, a government may issue

13 | reasonable regulations governing the time, place, or manner of speech.  *Ward v. Rock Against*

14 | *Racism*, 491 U.S. 781, 802-03 (1989).  For time, manner, and place restrictions to be valid they

15 | must not delegate overly broad discretion to a government official, must be narrowly tailored to

16 | serve a substantial governmental interest, and must leave open ample alternatives for

17 | communication.  *Seattle Affiliate of Oct. 22nd Coalition to Stop Police Brutality, Repression and*

18 | *Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 798 (9th Cir. 2008) (hereinafter

19 | *"Seattle Affiliate"*).  Plaintiffs contend the revised Guidelines give defendants "unfettered"

20 | discretion to enforce restrictions based on the content of the message, are not narrowly tailored,

21 | and do not provide ample alternatives for communication. (ECF 104.)  Each of these elements is

22 | addressed in turn.

23 |     1.  Discretion

24 |     Plaintiffs argue the new Guidelines give defendants unconstitutional levels of

25 | discretion to establish free expression zones.  (ECF 104 at 18-19.)  In the 2009 version of the

26 |

1   Guidelines, a zone is defined as a "designated area located on-site as established by the Cal Expo

2   Board of Directors at which members of the public may be provided reasonable access in

3   accordance with these guidelines for purposes of conducting free speech activities." (2009 Free

4   Speech Activities Guidelines, ECF 66-1 ¶ 5.)  The revised Guidelines state a zone is a

5   "designated area located on-site as established by Cal Expo's chief executive officer (general

6   manager), deputy general manager, *or any individual designated in writing by Cal Expo's chief*

7   *executive officer*, at which members of the public may be provided reasonable access in

8   accordance with these Guidelines for purposes of conducting free speech activities." (Decl. of

9   George Acero Re New Guidelines, ECF 98-1 at 1 (emphasis added).)

10          The thrust of plaintiffs' argument is the revised Guidelines give defendants'

11  management the power to delegate authority to an unspecified agent, which will result in a

12  "content based" determination of zone location.  (*Id.*)  However, plaintiffs provide no evidence

13  indicating defendants' unspecified agents are more likely to make a "content based"

14  determination of a zone, than are defendants' named agents.

15          The Ninth Circuit has held policies unconstitutional when they grant unbridled

16  discretion to government officials.  *See, e.g., Seattle Affiliate*, 550 F.3d at 803 (finding that

17  parade ordinance restricting use of streets that did not require officials to articulate their reason

18  for denying permit was unconstitutional).  However, in those cases, the discretion at issue was

19  not where the demonstrations may take place, but who actually receives permission to

20  demonstrate. *See id.* at 801.  Nothing in the provision of the revised Guidelines cited by

21  plaintiffs indicates defendants will be able to deny plaintiffs access to the zones, and plaintiffs do

22  not provide any evidence suggesting defendants have done so in the past.  (*See* ECF 104 at 18-

23  19.)  Although plaintiffs argued at the hearing that the behavior of Cal Expo's police force in the

24  past suggests that future discretion will be exercised in an arbitrary or content-based manner,

25  plaintiffs' earlier protest at Cal Expo did not occur during the State Fair, but rather at a time

26

1    when the Carson and Barnes Circus had taken over one of Cal Expo's parking lots.   Nothing in

2    the evidence before the court suggests there will be any arbitrary deviation from the well-

3    established Free Expression Zones during the State Fair.

4             2.  Narrow Tailoring

5             Plaintiffs argue the revised Guidelines are not narrowly tailored.  (ECF 104 at 14-

6    18.)  In order to be narrowly tailored a time, place, and manner restriction must serve a

7    substantial government interest and must not burden substantially more speech than is necessary

8    to further the government's legitimate interests.  *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 861

9    (9th Cir. 2004).  Plaintiffs argue defendants' use of Free Expression Zones does not further a

10   substantial government interest, and the Free Expression Zones burden more speech than is

11   necessary.  (ECF 104 at 14-18.)  Each of these elements is addressed below.

12             a. Substantial Government Interest

13             In order for a time, place, and manner restriction to be narrowly tailored it must

14   further a substantial government interest.  *Kuba*, 387 F.3d at 861.  Plaintiffs assert the revised

15   Guideline's zones do not serve a substantial government interest.  (ECF 104 at 19.)  Defendant

16   asserts the revised guideline's zones further Cal Expo's substantial interest in controlling large,

17   unruly crowds.  (Def.'s Opp'n to Pls.' Mot. for Prelim. Inj., ECF 76, 9-11.)  Although crowd

18   control has been identified as a substantial government interest, the burden is on Cal Expo to

19   provide "concrete evidence" the restriction furthers the government's claimed substantial

20   interest.  *Kuba*, 387 F.3d at 858 (citing *Weinberg v. City of Chicago*, 310 F.3d 1029, 1038 (7th

21   Cir. 2002)); *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000) (holding that burden

22   is on the state to prove restriction is necessary); *Carreras v. City of Anaheim*, 768 F.2d 1039,

23   1046 (9th Cir. 1985) (holding that mere inconvenience, annoyance, and loss of revenue are not

24   sufficient justifications to warrant restriction).  However, when the restriction on speech is

25   limited, the court may accept evidence based on "common sense" so long as it is more than

26

1   speculation.  *See, e.g., United Broth. of Carpenters and Joiners of Am. Loc. 586 v. N.L.R.B.*, 540

2   F.3d 957, 967-68 (9th Cir. 2008).

3                                     i.          Crowd Control

4          Here, defendants have met their burden of establishing that the zones in the

5   revised Guidelines further the substantial government interest of promoting public safety and

6   crowd control.  First, the physical characteristics of Cal Expo may provide sufficient evidence to

7   establish the zones further the substantial government interest of reducing congestion.  *See*

8   *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 654 (1981).  When

9   determining whether the physical characteristics of a forum alone provide sufficient evidence,

10  the court engages in a factual inquiry into the forum's size and number of occupants.  *See id.* at

11  651, 654.

12         In *Heffron*, the Court determined the government had a substantial interest in

13  managing crowds within fairgrounds that historically attracted large groups of people.  *Id.* at

14  654.  Based on a factual inquiry into the specific characteristics of the Minnesota State Fair, the

15  Court determined that because that Fair typically drew crowds numbering in the thousands and

16  required vendors to stay in fixed locations, a ban on the sale of religious materials outside

17  designated areas furthered the substantial interest of assuring the safe movement of Fair patrons.

18  *Id.*  According to the majority opinion, the physical characteristics of the fairgrounds alone were

19  enough evidence to prove the restriction furthered a substantial government interest.  *See id.*

20         In arguing defendants have not met their evidentiary burden, plaintiffs rely on the

21  Ninth Circuit's opinion in *Kuba.*  In *Kuba*, an agricultural fair association implemented a "First

22  Amendment Expression Policy" that created on-site "Free Expression Zones" for demonstrators.

23  387 F.3d at 853.  The zones were located on the perimeter of a parking lot far removed from the

24  main flow of  pedestrian  traffic.  *Id.* at 834.  In ruling in favor of the plaintiff, the Ninth Circuit

25  determined the defendants had not met their burden of establishing "that demonstrators handing

26

1    out leaflets and carrying signs on the parking lots and walkways outside the Cow Palace would

2    cause the congestion and danger to safety the Association alleges." *Id.* at 859.  The Cow Palace

3    had only received small numbers of protesters, and the defendants had not substantiated the

4    protestors' impact on congestion with objective evidence.  *Id.* at 862.

5             The Ninth Circuit in *Kuba* distinguished *Heffron* largely by relying on the

6    physical characteristics of the Cow Palace as compared to the Minnesota State Fairgrounds at

7    issue in *Heffron*.  *See Kuba*, 387 F.3d at 863. The Ninth Circuit noted the Minnesota fairgrounds

8    in *Heffron* attracted "between 115,000 and 160,000" patrons daily, making crowd control a

9    serious concern, while the Cow Palace only attracted approximately 10,000 people a day.  *Id.*

10   The Minnesota fairgrounds' display booths also created stopping points connected by narrow

11   channels, whereas the parking lot at issue in *Kuba* was an open area where traffic mingled about

12   freely, making congestion less of a concern.  *Id.* at 863. Thus, because congestion problems at

13   the Cow Palace posed little threat to public safety, the Ninth Circuit required the defendant in

14   *Kuba* to provide evidence establishing the plaintiff's activities caused the alleged congestion

15   problems, in effect requiring a more robust connection between the stated governmental interest

16   and the government's justification for its restrictions designed to accomplish that interest.

17            Like the defendant in *Kuba*, defendants have brought forward testimony

18   establishing a general congestion problem at Cal Expo, but have not brought forward any

19   evidence establishing a causal link between plaintiffs' activities, and the forum's congestion

20   problems.  (Decl. of Rick K. Pickering, ECF 77, ¶ 13.)  However, unlike the Cow Palace in

21   *Kuba,* the physical characteristics of the California State Fair are similar to the Minnesota State

22   Fairgrounds in *Heffron*.  According to defendants, the California State Fair draws approximately

23   40,695 persons per day to defendants' venue. (ECF 77 ¶ 7.)  During the Fair, large crowds gather

24   at the front gates and there have been large civil disturbances.  (*Id*. ¶ 14.)  In August 2003, some

25   time ago, a disturbance involving over 500 people occurred near the Cal Expo main gate.  (Decl.

26

1  of Robert Craft, ECF 76-2, ¶ 9.)  Smaller disturbances involving "50-100 rowdy subjects" are

2  common currently, and "[o]n any given night 300 to 400 patrons may be directed to leave." (*Id.* ¶

3  8.)

4              Applying the Ninth Circuit's analysis as developed in *Kuba* to the specific

5  physical characteristics of Cal Expo yields a different result than in that case.  Given the size of

6  the events held at Cal Expo, and the State Fair's history of disturbances, the physical

7  characteristics of the State Fair forum alone show the Free Expression Zones further the

8  substantial interest of reducing congestion and promoting public safety.

9                          ii.  Common Sense and Limited Restriction

10             Second, common sense and the zones' limited restrictiveness may be enough

11  direct evidence to establish defendants' revised Guidelines are valid.  *United Broth. of*

12  *Carpenters and Joiners*, 540 F.3d at 967-68 (citation omitted).  The Ninth Circuit in some cases

13  has taken a "common sense" approach to crowd control restrictions when the restriction on

14  speech is minimal, so long as the government's evidence is more than "mere speculation." *See*

15  *id*. at 967-68; *see also Cuviello v. City of Oakland*, 434 Fed. Appx. 615, 617 (9th Cir. 2011)

16  (unpublished) (finding that buffer zone around entrance to circus did not violate plaintiffs' First

17  Amendment rights).  Although a common sense justification can be used to mask other motives,

18  common sense also means that for restrictions based on safety, the government need not wait

19  until someone is injured before enacting regulations.  *Compare Klein v. City of San Clemente*,

20  584 F.3d 1196, 1204 (9th Cir. 2009) (finding that "common sense ... can all-too-easily be used to

21  mask unsupported conjecture, which is, of course, verboten in the First Amendment context"

22  when striking down an ordinance aimed at reducing litter) *with United Broth. of Carpenters and*

23  *Joiners,* 540 F.3d at 968 (finding that common sense supports the conclusion that rigid picket

24  signs with sharp corners could pose a threat to safety); *see also Marcavage v. City of New York*,

25  689 F.3d 98, 105 (2d Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S. Ct. 1492 (2013) (holding that

26

"[a]ll that is required is that the 'risk to public safety [be] substantial and real' instead of merely 'symbolic'" for a time, manner, and place restriction to be sufficiently narrowly tailored").

In *Cuviello*, the Ninth Circuit determined the district court's findings that the requirement of a ten foot "buffer zone" around the entrance to a circus was not based on mere speculation, but rather common sense. *See Cuviello,* 434 Fed. Appx. at 617. The Ninth Circuit reasoned that without the buffer zone "1) the entrance would become crowded and potentially unsafe; 2) ease of access for patrons would decrease; and 3) tensions between the parties would escalate." *Id.* at 616. Plaintiffs in *Cuviello*, as here, relied on *Kuba* in arguing the defendant provided no concrete evidence to establish a "substantial interest" in excluding the demonstrators from a buffer zone around the entrance to the circus. *Id.* However, the Ninth Circuit factually distinguished the restriction in *Cuviello* from the restriction in *Kuba* because the buffer zone in *Cuviello* was only ten feet from the entrance, whereas in *Kuba* the restriction encompassed "*every* area surrounding the Cow Palace other than zones 200–265 feet away from the entrance." *Id.* at 617 (emphasis in original). The Ninth Circuit noted, "[the district court's] common sense conclusions using the words 'could,' 'likely,' and 'potentially' does not make these conclusions equivalent to the speculation this court disapproved of in *Kuba*." *Id.* at  617.

As in *Cuviello*, the restriction here is unlike the restriction in *Kuba*. According to defendants, the zones are located near the main entrance to the State Fair, where the plaintiffs' target audience will pass within a matter of feet from plaintiffs. (ECF 76 at 17.) In *Kuba*, the restriction placed the protestors at a far remove from their target audience; therefore the court scrutinized the defendants' justification for the restriction closely.

As with the buffer zone in *Cuviello*, there are also common sense justifications for defendants establishing the zones in this case. If the entrance to the State Fair is overly crowded with protestors' tables, chairs, banners and other displays, the front gate could become unsafe, as it is the primary route of egress in the case of emergencies. (ECF 76-2 at ¶ 8.) Defendants

should not have to wait for someone to be injured due to protest-induced congestion to establish

a causal link between demonstration activities and risk of public injury.  Applying the

evidentiary requirement from *Kuba* as plaintiffs construe it would be the equivalent of forcing a

fire marshal to wait until a building catches on fire before she estimates the structure's maximum

capacity. *See Cuviello v. City of Oakland*, C 06-5517 MHP, 2010 WL 3199108 (N.D. Cal.

2010), *aff'd in part*, 434 Fed. Appx. 615 (9th Cir. 2011) (unpublished) (defendants need not

always actually incur harm prior to embarking upon stricter security measures in order to justify

those measures).

### iii.  Groups of Protestors, Tabling

In light of the record before the court, plaintiffs have not shown a substantial

likelihood of success on the merits on the question whether the revised Guidelines further a

substantial government interest as to stationary or groups of protestors.  The *Kuba* opinion, when

read together with the *Cuviello* decision, is telling of the Ninth Circuit's pragmatic approach to

time, manner, and place restrictions.  If a restriction has a limited effect on chilling speech, such

as with the buffer zone in *Cuviello*, the Ninth Circuit places less emphasis on the requirement

that the defendant provide direct evidence linking plaintiffs' activity to the furtherance of a

substantial interest. *See Cuviello* 434 Fed. Appx. at 617.  However, when the restriction

significantly limits the plaintiffs' ability to reach their target audience, the court requires the

defendant to provide more concrete evidence justifying the restriction. *Kuba*, 387 F.3d at 863.

As did the defendant in *Kuba*, defendants have brought forward testimony

establishing a general congestion problem at the gates of Cal Expo, but not brought forward any

evidence establishing a causal link between plaintiffs' activities, and the forum's congestion

problems. (Decl. of Rick K. Pickering, ECF 77, ¶ 13.)  At argument, plaintiffs stressed that they

have never caused problems at any place they have protested.  Nevertheless, it is not just

plaintiffs' activities, but the activities of all those who may use the space that govern the inquiry.

1
2
3
*See Heffron*, 452 U.S. at 653.  On this basis, the court finds that restricting protestors' tables, chairs, signs and other large paraphernalia to the Free Expression Zones is justified by Cal Expo's safety concerns.

4
iv.  Leafleting

5
6
7
8
9
10
11
12
13
14
15
16
Plaintiffs, however, have shown a substantial likelihood of success on the merits on their claim that restricting leafleting to the Free Expression Zones does not further a substantial interest.  The Revised Guidelines permit individuals to engage in one-on-one discussions with patrons outside the Free Expression Zones, yet Cal Expo has not explained how permitting these individuals to hand out leaflets as they talk to fair patrons will add to any congestion.  Moreover, as Cal Expo does not limit the number of patrons around the entrance at any one time, it has not shown that the addition of some protestors operating as individuals and moving through the crowds with literature renders the area around the entrances any more unsafe than does the existence of the crowds generally.  Even applying the lower common sense test does not save this restriction.  The court rejects plaintiffs' suggestion at hearing that leafleting is categorically exempt from reasonable time, place and manner restrictions, but in this case, the restriction is not narrowly tailored to further Cal Expo's objectives.

17
18
19
20
21
22
23
24
25
"Courts commonly recognize leafleting, or the offering of literature to those who might willingly except [*sic*] the same, as one of the least intrusive methods of free expression." *World Wide Street Preachers' Fellowship v. Peterson*, No. 1:03-CV-1516-JDT-TAB, 2004 WL 1622272, at *12 (S.D. Ind. May 14, 2004).  In *Saieg v. City of Dearborn*, 641 F.3d 727, 737-38 (6th Cir. 2011), the Sixth Circuit found that restrictions on leafleting during the City's Arab International Festival did not further the City's interest in controlling congestion, as the sidewalks within the festival area were left open to normal pedestrian traffic.  The court also found that restrictions on leafleting in the Festival's outer perimeter were substantially broader than necessary to further the City's interest in controlling vehicular traffic.  *See also Am. Civil*

26
16

*Liberties Union of Nevada v. City of Las Vegas*, 466 F.3d 784, 797 (9th Cir. 2006) (finding a restriction on distribution of handbills soliciting donations was not narrowly tailored to achieve goals of protecting pedestrians from aggressive solicitation and eliminating obstruction to the free movement of pedestrians).

> b.  Burdens More Speech than is Necessary

Plaintiffs' argue the revised Guidelines burden more speech than is necessary because they are unreasonably vague.  Plaintiffs state "[t]he scope of the activities gathered under [the new Guidelines] is sweeping" and is "irretrievably and impermissibly content-based." (ECF 104 at 21.)  A statute or policy may be unconstitutionally vague "if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) (internal citation omitted).  Although plaintiffs include this challenge as part of their challenge to the Free Expression Zones, it appears to be a separate inquiry, addressed below.  Plaintiffs do not otherwise argue that the Free Expression Zones themselves burden more speech than is necessary.

> 3.  Ample Alternatives for Communication

Plaintiffs argue being restricted to the Free Expression Zones impermissibly impedes free speech without justification because plaintiffs will not be able to approach patrons and hand out leaflets.  (ECF 104 at 23.)  The defendants assert the "Free Expression Zones," located by the main gate, puts the plaintiffs within one to twenty feet away from entering patrons, making it easy for them to communicate their message to visiting patrons.  (ECF 76 at 20.)

An alternative form of communication is not "ample" if it does not allow the party to reach its desired audience. *Berger v. City of Seattle*, 569 F.3d 1029, 1049 (9th Cir. 2009).  However, the restriction used does not have to be the least restrictive available. *Ward*,

491 U.S. at 798.  Restricting the equipment used to protest – signs, banners, and video or sound devices – to the Free Expression Zones does not prevent plaintiffs from communicating to the patrons who walk even twenty feet away from the zone.

Nevertheless, to the extent the Revised Guidelines do not permit leafleting outside the Free Expression Zones, they do not provide ample alternatives for plaintiffs to express their views for the reasons discussed above.

E.  Likelihood of Success on the Merits--Vagueness Challenges

"'[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in party's motion and the conduct asserted in the complaint.'" *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)).  In this case, plaintiffs raise a challenge to the permit requirement as applied to them and a facial challenge to the 2009 Guidelines.  As the complaint does not include any challenges to the amended guidelines, they cannot use this motion to challenge those provisions they believe are vague.

F.  Irreparable Harm

The Supreme Court and the Ninth Circuit have recognized that  "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013).  In this case, any irreparable harm is exacerbated by the State Fair's short duration.  Plaintiffs have established that the ban on leafleting outside the Free Expression Zones will irreparably impact their First Amendment rights.

G.  The Balance of the Hardships/Equities and the Public Interest

Cal Expo says little about the hardship it will face if plaintiffs' request for injunctive relief is granted except to argue that plaintiffs' true purpose seems more akin to harassment than genuine protest.

1    In First Amendment cases, the Ninth Circuit generally examines these two prongs
2  of the *Winter* inquiry in tandem, recognizing that when a regulation restricts First Amendment
3  rights, the equities tip in the plaintiffs' favor and advance the public interest in upholding free
4  speech principles.  *See Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128-29 (9th Cir. 2011);
5  *Kline v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (finding that plaintiff
6  challenging a ban on placing leaflets on windshields established that the loss of his First
7  Amendment rights tipped the equities in his favor and that the public interest also supported the
8  issuance of the injunction).  In light of defendant's anemic showing on hardship and public
9  interest, the court finds plaintiffs have established the last two *Winter* prongs.

10  III.  THE PRIOR MOTION FOR AN INJUNCTION

11    As noted, the court previously has found plaintiff Cuviello sufficiently established
12  his intent to demonstrate as an individual and so found he had standing to challenge the permit
13  requirement.  As the Revised Guidelines eliminated the permit requirement for groups of less
14  than twenty-five, the court gave the parties leave to address the impact of this revision on the
15  claim for injunctive relief.  In response, Cuviello submitted a new declaration without explaining
16  why he could not have done so in connection with the original motion.  At hearing, he claimed
17  he believed in good faith he could provide an additional declaration as part of his challenge to
18  the Revised Guidelines.  This belief was not reasonable in light of the court's explicit order,
19  directing the parties not to file declarations absent an explanation.  The court will not consider
20  the declaration.  Cuviello is cautioned that further failures to regard court orders will result in an
21  order to show cause why he should not be sanctioned.

22    In his supplemental brief, Cuviello argues that requiring permits for groups of
23  twenty-five still runs afoul of the First Amendment and raises some of the same arguments about
24  vagueness included in the second motion for injunctive relief.  As the court previously found he
25  does not have standing to raise these challenges, these arguments do not assist him.  As Cuviello

26

1   will not be required to register 72 hours in advance or to provide contact information to

2   undertake an individual protest, he is not facing imminent injury.  The earlier motion for a

3   preliminary injunction is denied.

4   IT IS THEREFORE ORDERED that:

5   1.  The court's order granting plaintiffs' motion for a temporary restraining order

6   is confirmed for the reasons stated above.

7   2.  Plaintiffs' motion for a preliminary injunction is granted in part as explained in

8   this order.  Defendants are enjoined from preventing plaintiffs from handing out leaflets in the

9   public areas of Cal Expo outside of the Free Expression Zones during the California State Fair,

10  July 12-28, 2013.  Plaintiffs' motion is denied in all other respects.

11  3.  Plaintiffs' first motion for a preliminary injunction (ECF No. 64) is denied.

12  DATED:  July 27, 2013.

13

14  _____
    UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26